UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ASHANTI WILLIAMS,

　　　Plaintiff,

　　　　v.

RI RA PORTLAND, LLC
d/b/a RI RA IRISH PUB
and
BUZZ HOSPITALITY, INC.

　　　Defendants.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Ashanti Williams ("Plaintiff" or "Mr. Williams"), by and

through undersigned counsel, and complains against the Defendants, Ri Ra Portland, LLC d/b/a Ri

Ra Irish Pub ("Ri Ra") and Buzz Hospitality, Inc. ("Buzz") as follows:

JURISDICTION AND PARTIES

1.　　　This action arises under Section 1981 of the 1886 Civil Rights Act, 42 U.S.C.

§1981, *et seq.*; the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq.*; the Maine

Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §§831 *et seq.*, as enforced through the

MHRA; and Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*.

2.　　　Ashanti Williams is a United States citizen residing in the City of Biddeford,

County of York, State of Maine.

3.　　　Buzz Hospitality, Inc. ("Buzz") is a food and beverage hospitality company that

is registered in Delaware and has its corporate offices in New York.

4.　　　Buzz operates a variety of brands.

1

5.    Buzz operates multiple restaurants in the Portland, Maine area.

6.    In addition to the Ri Ra Irish Pub in Portland, Buzz also owns and operates the restaurant Wilson County Barbecue located at 82 Hanover Street Suite 8, Portland, Maine.

7.    Buzz also owns and operates the restaurant Bar Publica located at 92 Hanover Street, Portland, Maine.

8.    Outside of Portland, Maine, Buzz owns and operates different Ri Ra Irish Pubs in Burlington, Vermont; Charlotte, North Carolina; and Las Vegas, Nevada (as well as their Ri Ra Irish Pub located in Portland, Maine).

9.    Buzz owns and operates a business called The Burlington Whiskey Room in Burlington, Vermont.

10.    Buzz owns and operates a restaurant called Keagan's Irish Pub and Kitchen in Virginia Beach, Virginia.

11.    Buzz owns and operates multiple restaurants and bars that are located outside of the United States, including Cat and Cage in Dublin, Ireland and TapHouse in Dublin, Ireland.

12.    Ri Ra Portland, LLC d/b/a Ri Ra Irish Pub ("Ri Ra") is a Maine corporation that operates a pub in Portland, Maine.

13.    Mr. Williams worked for Ri Ra at their Portland, Maine location.

14.    Buzz and Ri Ra are an integrated enterprise for the purposes of this complaint. They share common ownership, common management, interrelated operations, and interrelated Human Resources. For ease of reference, we refer to both corporations as Ri Ra in this complaint.

2

15.     By way of example, managers who oversaw the Portland location and had human resources responsibilities for the pub in Portland were employed by Buzz during the relevant period.

16.     Ri Ra had over 100 employees during the time that the discrimination and retaliation occurred.

17.     This Court has subject matter jurisdiction over Plaintiff's federal and state claims pursuant to 28 U.S.C. §§ 1331.

18.     On or about October 7, 2025, Mr. Williams filed a timely Complaint/Charge of Discrimination against Ri Ra and Buzz alleging unlawful discrimination and whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

19.     On or about June 29, 2026, the MHRC issued a Notice of Right to Sue with respect to Mr. Williams' state law claims.

20.     On or about July 2, 2026, the EEOC issued a Notice of Right to Sue with respect to Mr. Williams' federal law claims.

21.     Mr. Williams has exhausted his administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion.

### JURY TRIAL REQUESTED

22.     Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

### FACTUAL ALLEGATIONS

23.     Mr. Williams began working for Ri Ra on or about October 23, 2023 and worked there until his termination on August 26, 2025.

24.     Most recently, Mr. Williams worked for Ri Ra as a Bartender and earned $7.75 per hour plus tips. His wages averaged about $1,000 to $1,500 per week.

25.     Kelsey Madden is the Assistant General Manager at Ri Ra.

26.     Josh MacKellar and Cara Sellers are bartenders at Ri Ra.

27.     Spencer Calabrese is a sales representative employed by Southern Glazer's Wine and Spirits. In his capacity as a sales representative, Mr. Calabrese would work with Ri Ra staff to place orders for liquor, wine, and beer that would subsequently be delivered to Ri Ra.

28.     Mr. Williams is Black. He was the only Front of House employee who was Black at Ri Ra.

29.     Mr. Williams was frequently treated differently and worse than his white coworkers.

30.     Any time that Mr. Williams arrived at work late, he would be warned by his manager to be on time. When his white coworkers arrived late, nothing was said to them.

31.     Two employees in particular, Rosie Bernatti and Suzy Kuder, would frequently arrive late and would message in Ri Ra's employee platform that they would be late, but were not reprimanded.

32.     The Assistant General Manager, Kelsey Madden, told Mr. Williams that if he was late, he needed to make it up to her by bringing her a coffee from Dunkin Donuts.

33.     Mr. Williams frequently witnessed the white bartenders take home liquor that had been gifted to them by distributers without problem. The first time that Mr. Williams attempted to take home liquor that was gifted to him, he was terminated.

4

34.     Shortly after Ms. Madden, the Assistant General Manager, was hired by Ri Ra in June 2025, she began sexually harassing Mr. Williams. She called him "honey" and "handsome", frequently put her hands on his shoulders, and told him that she thought he was handsome.

35.     Ms. Madden told Mr. Williams that she planned to break up with her boyfriend and asked him out for drinks.

36.     In late July 2025, Mr. Williams repeatedly told Ms. Madden that he was in a relationship and rejected her sexual advances.

37.     When Mr. Williams informed Ms. Madden that he was not interested in having a relationship with her, she began treating him differently. She would frequently snap at him, which she had never done before. She also began micromanaging Mr. Williams and directing him to do tasks that he had already completed.

38.     On August 20, 2025, Spencer Calabrese came to Ri Ra while Mr. Williams was working to discuss an upcoming event that Mr. Williams would be helping to put on. They were planning a National Negroni Week menu with specialty cocktails.

39.     Once Mr. Calabrese and Mr. Williams had determined their plan regarding liquor orders, Mr. Williams asked Mr. Calabrese to approve it with Ms. Madden.

40.     After Mr. Calabrese approved their plans with Ms. Madden, Mr. Calabrese gifted Mr. Williams a bottle of Prairie Gin and asked Mr. Williams to sample it.

41.     Mr. Calabrese indicated that he wanted Mr. Williams to try it so he would consider advocating for it to be served at Ri Ra and incorporating it into the National Negroni Week menu.

42.     Mr. Calabrese made it clear that the gin was a personal gift for Mr. Williams and suggested that Mr. Williams bring it home to try it while he was not on the clock.

43.     Mr. Williams agreed to bring the gin home because he knew that he was not permitted to consume alcohol while working.

44.     Later in the evening on August 20, 2025, as Mr. Williams was preparing to leave, he showed Josh MacKellar (another bartender) the bottle of gin. Mr. Williams decided to leave the gin with Mr. MacKellar at the bar so that Mr. MacKellar could sample it and planned to take it home with him the following day.

45.     On August 21, 2025, when Mr. Williams arrived at work, there was a note on the bottle of gin saying that no one should open the bottle. The note was signed by Cara Sellers, another bartender.

46.     To the best of Mr. Williams' knowledge, Ms. Sellers was not a manager or supervisor. Mr. Williams had never been informed that she was his superior, so he viewed this note as a conversation between two employees about who got the free item as opposed to a directive from management. Because Ms. Sellers was not Mr. Williams' supervisor, he had no reason to believe that this note from Ms. Sellers equaled a company directive.

47.     Mr. Williams took the bottle of gin and put it in his bag before beginning his shift.

48.     A few hours after Mr. Williams began his shift, Ms. Sellers came into the bar looking for the bottle of gin. Mr. Williams informed Ms. Sellers that the gin was his and had been gifted to him by Mr. Calabrese.

49.     As Mr. Williams was leaving his shift on the evening of August 21, 2025, he received a call from Ms. Madden. She asked Mr. Williams if he had taken the bottle of gin, and

he told her that he had taken it and explained that it was gifted to him by Mr. Calabrese in preparation for National Negroni Week.

50.     Ms. Madden told Mr. Williams that the bottle of gin was not his and said that he needed to return it.

51.     After Ms. Madden told Mr. Williams to return the gin, Mr. Williams walked back into Ri Ra and returned it.

52.     Mr. Williams did not want to start any trouble, so he decided to obey Ms. Madden even though he disagreed with her.

53.     Later that night, Ms. Madden texted Mr. Williams informing him that his shift the following day would be covered by someone else. She told Mr. Williams not to come to work because he had created an issue by taking the gin and she needed to address it.

54.     Mr. Williams responded to Ms. Madden, reiterating that the gin had been gifted to him personally, and offered to show her messages between himself and Mr. Calabrese. Ms. Madden responded to Mr. Williams' message saying that she would not discuss the issue over text.

55.     On August 22, 2025, Ms. Madden called Mr. Williams and informed him that he was terminated. She told Mr. Williams that the reason for his termination was that he took alcohol from the bar.

56.     During the call, Ms. Madden claimed that the bottle of gin was "Ri Ra's bottle" and that Mr. Williams taking the bottle of gin from the bar was "illegal".

57.     There was an ongoing need for Mr. Williams' position at the time that he was terminated.

58.    Even when Mr. Williams explained to Ms. Madden that he had been given the gin as a personal gift, Ms. Madden insisted that it had been "illegal" for Mr. Williams to try to take the gin home with him.

59.    Mr. Williams made it clear that the gin had been gifted to him personally (and not to Ri Ra as a whole) because he and Mr. Calabrese were planning a menu for National Negroni Week that necessitated the use of multiple types of gin.

60.    In their submission to the MHRC, Defendants have claimed that Mr. Williams was untruthful when asked if he had taken the liquor because he said he had been gifted "corn gin" but had taken a bottle of Prairie-brand Gin. Gin is most typically made from fermented wheat or barley, but all products made by the Prairie Organic Spirits brand are made of fermented corn and, therefore, the "Prairie Gin" is also "corn gin". This is what the Prairie brand is known for, and any knowledgeable bartender would be aware of this fact.

61.    Mr. Williams identified the product as "corn gin" because of its novelty and unusual ingredients, since the fermented corn gives it a unique flavor.

62.    Ri Ra had never informed Mr. Williams that it was against the rules to take home alcohol that was gifted to an employee.

63.    Mr. Williams has witnessed white bartenders at Ri Ra take home beer, wine, and spirits that were gifted by distributors. Upon information and belief, none of these employees were reprimanded.

64.    Mr. Williams witnessed the vendors from both Blaze Brewing and Batson River gift white bartenders Jefferson Grundy and Josh MacKellar free alcohol at Ri Ra. Both bartenders took the alcohol home with them without problem.

65. Defendants' handbook includes a policy about improper receiving of gifts that states "This includes gifts with a monetary value, for example offers of trips as a product sales incentive, tickets for shows, sporting events and any perishable or commemorative items".

66. The bottle of gin that Mr. Williams was given was labelled "sample – not for resale". This small, sample-sized bottle of liquor has little to no monetary value. It cannot be sold or purchased, nor is it perishable.

67. Ms. Madden made no reference to this policy or violation of this policy when she fired Mr. Williams.

68. Further, Mr. Williams was clearly told by Mr. Calabrese that the gin was for him personally to sample because they were planning a menu for a negroni-based event at Ri Ra.

69. A negroni is a drink made of equal parts gin, Campari, and vermouth, but bartenders can create variations that incorporate different flavors and types of liquor.

70. It is typical and expected that bartenders will sample a new drink that they create before adding it to a menu and serving it to the public. The drink must be sampled to ensure that it tastes good and the recipe is correct.

71. To determine which flavors might pair best with the Prairie gin in question, Mr. Williams would need to be familiar with the flavor profile of the gin.

72. Since Mr. Williams did not want to violate Ri Ra's policies by consuming alcohol while at work, he decided to take the gin home to sample it and consider how he might incorporate it into a negroni recipe.

73. In this context, Mr. Williams did not view the gin as a "gift" the way one is described in Ri Ra's employee handbook, but rather as a tool that he would use to successfully

9

do his job. Therefore, the claim that Mr. Williams violated company policy by taking home the gin is not plausible.

74. Also, when Ms. Madden notified Mr. Williams that she wanted him to return the bottle, he explained his reasonable belief that it was appropriate for him to take it home and indicated that Mr. Calabrese could confirm that he gave the bottle to Mr. Williams for him to take and sample.

75. Further, he promptly returned the bottle.

76. From his response, it is very clear that Mr. Williams was not engaging in any intentional violation of policy or wrongdoing.

77. As the First Circuit noted in *Roy v. Correct Care,* pretext can be shown through facts that expose weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons". *Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 71 (1st Cir. 2019) ("pretext can be shown through facts that expose weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons") (internal citations omitted).  Defendants' explanations for Mr. Williams' termination are weak, implausible, inconsistent with their treatment of other employees, and contradicted by Defendants' practices.

78. It is weak and implausible for Defendants to claim that Mr. Williams engaged in theft or acted in a manner that showed an intentional violation of policy or lack of trustworthiness.

79. In addition, at the time, Ms. Madden characterized Mr. Williams' taking the bottle home as "illegal".  In other words, she was not presenting the situation as a violation of company policy, she was claiming that he violated the law and was stealing the bottle.

10

80.     Ms.  Madden's claim that Mr. Williams was violating the law was preposterous and also reflects that the Defendants' subsequent effort to characterize the situation as a policy violation was something that was decided after the fact because Ms. Madden's characterization that he was breaking the law was unbelievable.

81.     On August 28, 2025, two days after Mr. Williams was fired, Managing Partner of Ri Ra, Spencer Pratt, emailed a State liquor inspector and falsely claimed that Mr. Williams had engaged in and had been terminated for "theft".

82.     Notably, Defendants' position is premised on the false claims that the bottle of gin "was not 'given' or 'gifted' to Complainant personally" and that "it was provided by the liquor company rep for use by Ri Ra in the event." Defendants also argued, without merit, that the bottle gifted to Mr. Williams and the bottle he took home are different bottles.

83.     Defendants make these factual arguments to support the claim that Mr. Williams unlawfully stole the bottle, which is what Ms. Madden claimed at the time of his termination.

84.     Defendants later contradicted their factual allegations and argument about Mr. Williams stealing the bottle and acknowledged that Mr. Calabrese may have given the bottle to Mr. Williams but that "Whatever the sales representative said to Complainant about whether he could have the bottle is irrelevant".

85.     In this way Defendants try to have it both ways, that Mr. Williams was terminated for stealing the bottle without authorization and also that he was terminated despite the fact that he was given the bottle to sample. Defendants cannot have it both ways.

86.     This approach reflects that Defendants know that Mr. Calabrese will confirm that he provided the bottle to Mr. Williams for him to take and sample.

11

87.    Defendants' effort to shift to the new rationale that Mr. Williams did not steal the bottle but nonetheless violated policy is further evidence of pretext. *See Vieques Air Link, Inc. v. U.S. Dep't of Labor*, 437 F.3 102 (1st Cir. 2006) ("[T]he fact that an employer offers shifting explanations for its challenged personnel action can itself serve to demonstrate pretext.").

88.    In addition, the evidence that Mr. Williams was treated differently and worse than coworkers who were white and who had not rejected their manager's advances is glaring.

89.    Mr. Williams has personally witnessed two of Ri Ra's white bartenders receive liquor as a gift from distributors and take it home with them with the knowledge of management. These white bartenders were not terminated, which Mr. Williams is aware of because he continued to work with them after he witnessed them take the liquor home.

90.    Upon information and belief, the white bartenders received no warnings or disciplinary action for taking home liquor that was gifted to them.

91.    If anything, the actions of the white employees were more problematic where they took the product home. Mr. Williams immediately returned the bottle of gin to Ri Ra after Ms. Madden asked him to do so.

92.    The fact that it was common practice for employees to take home samples provided by distributors is reenforced by the fact that bartender Cara Sellers put the note on the bottle of gin in question and came looking for it.

93.    Mr. Williams never saw Ms. Madden make romantic overtures towards these other employees.

94.     The fact that Mr. Williams, a Black employee who rejected his manager's advances, was terminated for the same actions that two white employees who did not reject her advances did with no discipline is clear evidence of racial discrimination and retaliation.

95.     Mr. Williams had never received any prior disciplinary action and he did not receive any progressive discipline prior to his termination.

96.     This evidence constitutes extremely probative comparator evidence. *Ray v. Ropes & Gray LLP,* 799 F.3d 99, 114 (1st Cir. 2015) ("'Reasonableness is the touchstone' when considering comparators in a disparate treatment case; that is, "while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances…We ask whether 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'")(internal citations omitted).

97.     The "relevant facts and circumstances" in this matter are the nature of the alleged violations and the manager making the decision whether or not to discipline.

98.     Here, the alleged violations and the manager who supervised the employees and made the decision to terminate Mr. Williams and retain the other employees without any discipline are identical. *Ripoli v. Dep't of Hum. Servs., Off. of Veterans Servs.*, 123 F.4th 565, 578 (1st Cir. 2024)("The State's isthmian view of comparability" is at odds with our precedent. In the context of offering comparator evidence to raise an inference of discrimination in a disparate treatment case, "similarity, rather than identicality, provides the essential requirement for an analogy.") (internal citations omitted).

99.     This comparator evidence also serves as additional evidence of pretext. *Mesnick v. Gen. Elec. Co.* 950 F.2d. 816, 828 (1st Cir. 1991) ("Evidence of different treatment in the

13

workplace is a type of circumstantial evidence that can demonstrate retaliation in a way sufficient to leap the summary judgment or directed verdict hurdles."); *Rathbun v. Autozone, Inc.,* 361 F.3d 62, 72 (1st Cir.2004) (holding that ways of showing pretext include but are not limited to "evidence of differential treatment, evidence of discriminatory comments, statistical evidence, and comparative evidence"); *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 450 (1st Cir. 2009) (holding that a jury could find evidence of disparate treatment sufficient in itself to support a finding that the stated reason for termination is pretext and the true motivation was discriminatory.) *Che v. Massachusetts Bay Transp. Auth.,* 342 F.3d 31, 38-39 (1st Cir. 2003)(holding that pretext evidence may include evidence that the defendant's asserted reason for its adverse action against the plaintiff lacked credibility or evidence that the defendant treated the plaintiff differently than other similarly situated employees.)

100.    Defendants' termination of Mr. Williams also violates its own Disciplinary Action policy which states:

> "To deliver a consistently fair application and enforcement of Company rules and provide equitable treatment to all...employees, a disciplinary program will be maintained in the Location.  Violating Company Policy, Procedure or Rule of Conduct will result in the next level of disciplinary action, up to and including termination...Progressive disciplinary action has five levels: Verbal warning..1st written warning...Final written warning...Suspension without pay...Termination."

101.    To the extent that Mr. Williams' acceptance of the sample bottle violated Defendants' gift policy, then the appropriate progressive discipline would have been a verbal warning, not a termination.

14

102.   Defendants' policy provides for immediate termination for egregious behavior such as possessing and using drugs, fighting on location premises, and theft.

103.   Ms. Madden likely misrepresented the facts and alleged that Mr. Williams engaged in "theft" of the bottle to justify wrongfully terminating Mr. Williams when termination was not warranted under Defendants' own policy. This is strong evidence of pretext. *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 29 (1st Cir.1998); *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 143 (1st Cir. 2012); *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 169 (1st Cir.1998); *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 489, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997); *Collazo v. Bristol-Myers Squibb Mfg., Inc.,* 617 F.3d 39, 52 (1st Cir. 2010).

104.   Last, the way in which Ms. Madden's treatment of Mr. Williams changed after he rejected her advances and the hostility which she exhibited towards him after the rejection serves as strong evidence of a causal connection between Mr. Williams' rejection of the advances, clearly protected activity, and his pretextual termination.

105.   Ms. Madden's change in behavior when Mr. Williams rejected her sexual advances and her decision to terminate Mr. Williams constitute sex discrimination and quid pro quo harassment.

106.   Mr. Calabrese will confirm that he gave the bottle to Mr. Williams, personally, for him to sample.

107.   Mr. Williams was terminated in retaliation for rejecting Ms. Madden's sexual advances and opposing her harassment of him.

15

108. Ms. Madden treated Mr. Williams differently and worse because he is male and, in particular, made sexual advances and engaged in sexual harassment towards him because of sex and his sex was a motivating factor in his termination.

109. Mr. Williams' opposition to sexual harassment and sex discrimination constituted protected activity under the MWPA, MHRA, 42 U.S.C. sec. 1981 and Title VII and Defendant violated his rights by retaliating against him for making these reports.

110. Mr. Williams was terminated because of race and his race was a motivating factor in the decision to terminate his employment, in violation of the MHRA, Title VII and 42 U.S.C. sec. 1981.

### COUNT I: Section 1981- Race Discrimination

111. Paragraphs 1-110 are incorporated by reference.

112. Defendants' conduct violated Plaintiff's rights under Section 1981 to be free from discrimination on the basis of race and color.

### COUNT II: Title VII – Race Discrimination

113. Paragraphs 1-112 are incorporated by reference.

114. Defendants' conduct violated Plaintiff's right to be free from employment discrimination based on race, color, ancestry, and national origin.

### COUNT III: MHRA – Race Discrimination

115. Paragraphs 1-114 are incorporated by reference.

116. Defendants' conduct violated Plaintiff's right to be free from employment discrimination based on race, color, ancestry, and national origin.

### COUNT IV: Title VII – Sex Discrimination

117. Paragraphs 1-116 are incorporated by reference.

16

118.    Defendants' conduct violated Plaintiff's right to be free from employment discrimination based on sex.

### COUNT V: MHRA – Sex Discrimination

119.    Paragraphs 1-118 are incorporated by reference.

120.    Defendants' conduct violated Plaintiff's right to be free from employment discrimination based on sex.

### COUNT VI: Section 1981- Retaliation

121.    Paragraphs 1-120 are incorporated by reference.

122.    Defendants' conduct violated Plaintiff's rights under Section 1981 to be free from retaliation for engaging in protected reports and opposition.

### COUNT VII: Title VII – Race Discrimination

123.    Paragraphs 1-122 are incorporated by reference.

124.    Defendants' conduct violated Plaintiff's rights under Title VII to be free from retaliation for engaging in protected reports and opposition.

### COUNT VIII: MHRA - Retaliation

125.    Paragraphs 1-124 are incorporated by reference.

126.    Defendants' conduct violated the MHRA's prohibition against interfering with any individual in the exercise or enjoyment of the rights granted under the MHRA.

### COUNT IX: MWPA Retaliation

127.    Paragraphs 1-126 are incorporated by reference.

128.    Defendants' conduct violated the MWPA by retaliating against Plaintiff because he engaged in protected activity under the MWPA, as enforced through the MHRA.

17

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendants to be in violation of his rights;

B.    Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate his rights;

C.    Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award equitable-relief for back pay, benefits and prejudgment interest;

E.    Award compensatory damages in an amount to be determined at trial;

F.    Award punitive damages in an amount to be determined at trial;

G.    Award nominal damages;

H.    Award attorneys' fees, including legal expenses, and costs;

I.    Award prejudgment interest;

J.    Permanently enjoin Defendants from engaging in any employment practices which discriminate on the basis of race and color;

K.    Require Defendants to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate discrimination in the future;

L.    Require that Defendants post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

M.    Require that Defendants train all management level employees on the protections afforded by Section 1981, Title VII, MHRA, and MWPA;

N.    Require that Defendants place a document in Plaintiff's personnel files which explains that Defendants unlawfully terminated him because of race and color; and

O.    Grant to Plaintiff such other and further relief as may be just and proper.

18

19

Dated: July 6, 2026                    /s/ Chad T. Hansen
                                        Chad T. Hansen
                                        Attorney for Plaintiff

                                        ***EMPLOYEE RIGHTS GROUP***
                                        92 Exchange Street, Second floor
                                        Portland, Maine 04101
                                        Tel. (207) 874-0905
                                        Fax (207) 874-0343
                                        Chad@EmployeeRightsLaw.Attorney